[Civ. No. 26090. Second Dist., Div. One. Jan. 22, 1963.]

GLADYS KOVITZ KESSELMAN, Plaintiff and Appellant, v. LOUIS M. KESSELMAN, Defendant and Appellant.

Rudolph Pacht for Plaintiff and Appellant.

David Charness for Defendant and Appellant.

WOOD, P. J.—In this divorce action, plaintiff (wife) appeals from an order granting defendant's motion to set aside his default. Defendant appeals from an order that he pay $1,500 as attorney's fees to plaintiff's attorney for services in resisting the motion.

On August 22, 1958, the parties made an antenuptial agreement which provided, in part, that each one should continue to own his or her separate property as separate property, and that money or other property received during marriage for services rendered should be the separate property of the one rendering the services.

They were married on August 31, 1958.

In March 1959, plaintiff commenced an action for divorce (her counsel therein was not her present counsel). Defendant, who was then represented by his present counsel, signed his proposed answer to that complaint, which answer set forth the antenuptial agreement as a bar to any demand of plaintiff for any part of his property. Prior to the filing of that answer, the parties became reconciled and the action was dismissed (May 14, 1959).

In September 1959 defendant suffered a cerebral stroke which affected his ability to speak and walk.

In March 1961 the parties, while in the office of present counsel for plaintiff, executed a cancellation of the antenuptial agreement under circumstances hereinafter referred to.

About April 26, 1961, while the parties were again in said

office, they allegedly agreed upon monthly amounts to be paid by defendant to plaintiff as alimony for 53 months, in the event a decree of divorce should be entered in favor of plaintiff. At that time they also allegedly agreed that defendant would designate plaintiff as beneficiary of certain life insurance during said period of 53 months.

In the complaint in the present action, which was filed on May 5, 1961, plaintiff sought a divorce and an order directing defendant to perform the agreement with respect to alimony and making her the beneficiary of life insurance. Summons and complaint were served on defendant on May 9, 1961, and his default was entered on May 25, 1961.

On June 9, 1961, while the parties were in the office of counsel for plaintiff, they amended their alleged financial agreement (as to alimony and insurance) to provide that defendant would make a codicil to his will, giving a net-additional amount of $15,000 to plaintiff (additional to alimony already agreed upon). Thereupon, the defendant made such a codicil.

On June 11, 1961, defendant went by airplane to Milwaukee, Wisconsin, where two of his adult daughters resided. The next day he sent a letter to plaintiff, stating that, upon thinking it over carefully, he did not want to consider a divorce from her and he had telephoned Mr. Charness (his present counsel) and told him to oppose the divorce.

(Details regarding some of the above-mentioned matters will be referred to hereinafter.)

Defendant's notice of motion to set aside his default was filed on July 3, 1961. The notice stated that it would be made on the ground that his failure to answer was due to mistake, inadvertence, excusable neglect, and misunderstanding by defendant as to the effect of the service of summons and complaint upon him. Affidavits of defendant and his attorney to the effect that defendant has a meritorious defense were filed at the same time the notice was filed. Also, defendant's proposed answer and proposed cross-complaint were filed at that time.

In an affidavit in support of the motion Mr. Kesselman stated, in substance, as follows: The summons and complaint were served on him in Los Angeles sometime between May 5 and May 25, 1961. At the time he was served he was mentally ill as a result of several cerebral strokes which he had within the two years preceding the making of his affidavit. He is 72 years old, and it is doubtful that he will recover

fully from the effects of the strokes. Prior to the commencement of the action, plaintiff indicated to him that he should return to Milwaukee, where he had formerly resided, to visit his adult daughters and to find relief from hay fever. She also told him that she would resume living with him as his wife and would take care of him at any time he requested her to do so. He has ascertained recently that plaintiff no longer desires to live with him or resume the marital relationship, but that she wishes a divorce. He did not realize that he had to file an answer to the complaint, because he did not believe that his wife intended to live apart from him on a permanent basis. He does not recall making any agreement with her to pay alimony, or to transfer certain policies of life insurance to her, as set forth in the complaint. About the time the summons and complaint were served on him, his wife told him that the service of "these papers" was a mere matter of form and had no legal effect in the event that he wanted her to live with him as husband and wife. Before this action was commenced, the plaintiff improperly influenced him to cancel an antenuptial agreement which they had signed about August 22, 1958, which agreement is more fully set forth in his proposed answer and proposed cross-complaint. He did not understand that in executing the cancellation agreement he had eliminated the provisions of the antenuptial agreement controlling the matter of property division, thereby enabling plaintiff to ask for substantial alimony and the transfer of certain life insurance policies to her, as more fully set forth in the complaint. Prior to June 12, 1961, he did not retain an attorney with respect to the action for the reason that he did not realize that he was required to have an attorney to protect his rights therein. On June 12, 1961, he became apprehensive of the attitude of plaintiff with respect to resuming their relationship and living with him, and he called attorney Charness, in Los Angeles, by telephone from Milwaukee. Mr. Charness, who had represented him in previous matters and in the drawing of the antenuptial agreement, informed him that he was "most likely" in default. He (defendant) made a mistake in failing to answer the complaint within the proper time, and was under the mistaken impression that he was not obliged to answer as long as plaintiff agreed to resume living with affiant at any time that he requested her to do so. Consequently, he "inadvertently neglected" to prepare and file his answer, which inadvertence

and neglect the affiant believes to be excusable under all the circumstances set forth.

In an affidavit in support of the motion, Mr. Charness, attorney for defendant, stated in substance as follows: He had known defendant about 27 years; he represented him in various legal matters between 1952 and March 1961; and to the best of his knowledge he was defendant's only attorney during that period. In March 1959, when plaintiff commenced the other action for divorce, she was represented by counsel other than her present counsel. Affiant (defendant's present counsel) represented defendant therein. During the preparation of the answer in that action, defendant was very firm and emphatic that the antenuptial agreement be made a part of the answer and cross-complaint, and be set up as a bar and defense to any demand of plaintiff for any part of his property. Affiant informed the former counsel for plaintiff that defendant was relying on the antenuptial agreement, and was not willing to give any property to plaintiff or to make any concession about it. That prior to filing the answer therein, that action was dismissed. In August 1959 defendant had a cerebral stroke or strokes which caused him to be hospitalized and resulted in defects in his ability to speak and walk. He has not fully recovered from the effects of the stroke or strokes. On August 31, 1958, and at times thereafter until approximately February 1961, defendant told him that plaintiff was demanding that he give some of his property to her, that she was threatening to leave him if he did not comply with her demands, that the demands were increasing, and that the demands and threats were causing him great despair. Before defendant suffered the stroke or strokes, he was a very determined person, who was not inclined to weakness in decision, compromise, or making concessions. After the stroke or strokes he was easily influenced, was susceptible to suggestions, and became mentally confused in conducting business affairs. Defendant told affiant that by reason of the demands of plaintiff and her threats to leave him, he conveyed to her an apartment house on Woodman Avenue in Van Nuys, which apartment house, under the antenuptial agreement, she was entitled to receive only if she lived with him for 10 years or until his death. He also said that she had sold the apartment house for $27,000. Defendant also told affiant that, in February 1961, by reason of the demands and threats of plaintiff, he paid $27,000 as the purchase price for two parcels of real property on Victory Boule-

vard in Van Nuys, and caused the parcels to be conveyed to plaintiff. In conversations between affiant and defendant regarding such conveyance, it appeared to affiant that defendant was confused, uncertain, and was under great mental strain or undue influence of plaintiff. It would be unusual for the defendant to cancel the antenuptial agreement without discussing the matter with affiant, who had represented defendant in the preparation of the agreement. The relationship between affiant and defendant was pleasant, and it was defendant's custom to telephone affiant at unusual times with respect to legal or business matters. The files show that the summons and complaint were served on defendant at the office of present counsel for plaintiff. After such service (about a month later), at the instance of plaintiff, her present counsel prepared a codicil to defendant's will wherein the gift to plaintiff was increased over any gift left to her in prior codicils. Defendant was charged $100 for the preparation of the codicil.

The affidavit of Mrs. Kesselman in opposition to the motion stated, in part, as follows: Defendant did not misunderstand the effect of the service of summons and complaint on him. He had only one stroke since their marriage, and she never noticed that the stroke had any effect on his mental processes. He has always attended to his many involved and substantial business affairs. Her present counsel explained to her and to defendant, at the time agreement was reached with regard to "alimony, etc.," the procedure to be followed. He told them that he would prepare the complaint, he would ask defendant to approve it before it was filed and to come into the office to be served; and that after defendant's default was entered, she and her witness would go to court and testify, and in all probability the court would grant the relief prayed for. She is satisfied that defendant understood that explanation. She never told defendant that she was willing to resume living with him at any time that he desired her to do so. She told him that she was tired of his continually changing his mind as to whether he would return to Milwaukee permanently, and if he did return there permanently, she would try to obtain a divorce, although she was willing to continue to live with him in California. He told her that his reason for returning there was that he realized the life she was leading was becoming more unbearable because she was required to be practically a 24-hour nurse for him by reason

of his inability to control his physical functions. She never attempted to influence defendant as to any matter. He was strong-willed and seldom took the advice of anyone. After they had agreed, in her attorney's office, as to alimony and life insurance, and before they returned there to read the divorce complaint, defendant told her that he had talked to his attorney, Mr. Charness, who had advised him not to sign any papers and not to pay alimony. Defendant also said that in spite of that advice he was going to sign the papers and pay the alimony. She never did anything to cause him to execute the agreement of March 16, 1961, cancelling the antenuptial agreement. Before such cancelling agreement was made, her attorney expressed his views regarding antenuptial agreements in general, the effect that the agreement may have had on their marriage, and the effect that its cancellation might have on the marriage. Then defendant asked the attorney to prepare a document cancelling the agreement. Thereupon the attorney prepared the agreement and they signed it. With reference to the amount of alimony she needed, she said that whatever amount defendant thought was fair would be all right. After defendant asked the attorney to suggest what amount would be fair, and after the attorney suggested an amount, they agreed with the suggestion. When they returned to the office to read the complaint, defendant said he could not pay the installments of alimony as agreed. After some discussion, she and defendant agreed upon smaller payments over a longer period of time. When they returned to the office later to read the revised complaint, the defendant expressed approval of the complaint, and he initialed the attorney's copy of it. She did not advise defendant that he should return to Milwaukee to visit his daughters or to find relief from hay fever, or for any other purpose. On June 12, 1961, the day after his arrival in Milwaukee, he wrote a letter to her, stating in part: "It has been just a day and a half since I left you, and I'm lonesome for you already. I find, upon thinking it over carefully on the phone, that I don't want to even consider divorce from you. . . . I will visit here in Milwaukee until July 15 or so, the usual date of the start of hay fever and asthma here. . . . Because of this decision I have telephoned Attorney Dave Charness to appear in court next Monday to oppose the divorce." On June 14, 1961, she replied to his letter, stating in part: "I received your surprising letter of June 12th. Since you are going anyway to remain in Milwaukee until July

15th, why don't you think the matter over at least till then before coming to a final decision. In the meantime I shall obtain the divorce on the 22nd. . . . To refresh your memory, and set the record straight. . . . I did not tell you that I would be glad to have you back or that I would be glad to forget about the divorce and live with you again as man and wife.'' She never told defendant that the antenuptial agreement was void or of no effect. After they had cancelled that agreement, he told her that the antenuptial agreement had been a mistake and that he was happy that it was cancelled. She has read defendant's proposed answer and proposed cross-complaint, and she is convinced that no substantial proof can be presented in support of the many false allegations therein, and that he does not have a meritorious defense or any cause of action for divorce.

The affidavit of Mr. Rudolph Pacht, in opposition to the motion, stated in part: As an attorney at law he has represented plaintiff in this action since the middle of April 1961. In March 1961, the parties consulted him regarding a transfer of title to real property. Shortly thereafter he was consulted by them regarding their marital problems, with the result that they then agreed to try to salvage the marriage. During that conference he advised them that one of the reasons for their difficulties might be the antenuptial agreement. He suggested that if they meant what they said about trying to salvage the marriage, they should cancel the antenuptial agreement, and if they did so, their chances of salvaging the marriage would be greatly increased. Thereupon, the parties asked him to prepare the cancellation agreement, and after he prepared it, they executed it. The only other occasion on which he rendered services for defendant was about eight weeks later when he prepared a codicil to his will. About a month after the reconciliation in his office, the plaintiff consulted him by telephone and made an appointment to come to his office. That day or the next day, the parties came to his office. He explained to defendant he could not represent both of them, that he would represent plaintiff only, and if defendant felt that he needed counsel, he should obtain independent counsel. He expressed to defendant his opinion that contested litigation would not be necessary or appropriate, and that differences should be capable of resolution by negotiation. The parties agreed that she would seek a divorce and he would not contest the action; that certain

alimony payments would be made by him; and that he would designate her as beneficiary of a certain life insurance policy for a specified time. She did not make any demand upon him, nor attempt to influence him with regard to financial matters. He asked affiant to suggest what he thought was fair. The agreement reached was based upon affiant's suggestion. He explained the procedure which would be followed, and he is satisfied that defendant understood everything that was said, including the explanation as to the effect of service of summons and complaint upon him. Defendant approved the complaint by initialing a copy of the complaint. At all times the defendant appeared to be in full possession of his mental faculties. When defendant first consulted affiant, he expressed his firm intention to remove permanently to Milwaukee. Affiant never represented to defendant that the antenuptial agreement was void or ineffectual. Defendant entered into the cancellation agreement freely and voluntarily. Affiant never suggested to defendant that he transfer any insurance policies.

An affidavit of Helen Ellis, in opposition to the motion, stated in part: She was employed by defendant as his housekeeper approximately six years, until June 30, 1961. During the last three years of that time, defendant was married to plaintiff. About June 7, 1961, at the request of defendant, she began packing all of his personal effects, clothing, papers, and typewriter. While she was finishing that work on the morning of June 11, she asked him which of the boxes were to go to the cooperative apartment and which were to go to Milwaukee. He replied that everything was going to Milwaukee. She then remarked that it looked as though he were going for good. He replied that he was going for good, and that plaintiff had obtained an apartment here. Before plaintiff and defendant left for the airport on that day, he said goodbye and told her to take good care of plaintiff, and to go to the office of plaintiff's attorney and that there would not be much to the hearing in the divorce case because he was not contesting it. Defendant never appeared to be suffering from any mental illness, but on the contrary was always alert and had a remarkable memory. On many occasions in May and June 1961 she received telephone calls from Mr. Charness when the plaintiff and defendant were not at home, and usually Mr. Charness requested that defendant return the call. About June 13 or 14 she received a letter from defendant, sent from Milwaukee, which stated: "After thinking it

over very carefully, I have decided that I do not want a divorce from Gladys at all, and I am writing you to tell you of my change of mind. . . . Gladys always told me that she would be glad to have me back at any time, so I am having my attorney Mr. Charness oppose the divorce. . . .''

In an affidavit of defendant, in reply to statements in the affidavits of plaintiff, her attorney, and Helen Ellis, he stated: The statements in the affidavit of his attorney (Mr. Charness) are true. Many of the statements contained in the affidavits of plaintiff and Helen Ellis are false. He believed that service of the summons and complaint on him would not interfere with nor affect the promise of plaintiff to resume living with him at any time that he desired that she do so. Plaintiff's attorney did not indicate or suggest to him that he seek independent legal counsel. Starting in the latter part of 1960, plaintiff began a deliberate scheme to get him to leave her and go to Milwaukee to reside with his daughters. She told him that it would be better for him to be with his daughters, and that she had no regard for or any interest in him. After the dismissal of her first action for divorce in May 1959, she urged him to give substantial property to her, regardless of the antenuptial agreement. As a result of her demands and threats to leave him, he, in desperation, conveyed or caused to be conveyed to her the four parcels of real property referred to in his attorney's affidavit, and he agreed to cancel the antenuptial agreement. Before he had the cerebral strokes in August and September 1959, he had a strong will and was self-reliant, but thereafter he was inclined to be easily influenced by other persons and especially by plaintiff. On June 12, 1961, while he was away from plaintiff, he became apprehensive of her attitude toward him. Helen Ellis never told him that it looked as if he were leaving ''for good,'' and he never told her that he was leaving for good. After the strokes he was mentally ill and was not alert. He did not telephone his attorney after April 1961, for the reason he did not realize that he had to have legal advice. It seemed to him that Helen Ellis had become vindictive toward him because, under the provisions of a codicil, he had omitted her as a beneficiary under his will.

In an affidavit of Mr. Charness, in reply to statements in affidavits of plaintiff and Helen Ellis, he stated, in part: Defendant did not speak to him relative to approval of a proposed complaint for divorce. Affiant did not know any-

thing about this divorce action until June 12, 1961, when defendant telephoned him from Milwaukee. Affiant did not receive any telephone call from defendant in May and June 1961.

Appellant (plaintiff) contends that the defendant did not prove the kind of inadvertence, mistake, or excusable neglect required for relief from default under section 473 of the Code of Civil Procedure. She argues that the evidence shows that defendant's failure to appear was planned deliberately by him; that he knew what he was doing when he let his default be entered; and that thereafter he merely changed his mind; that his claim that plaintiff would return any time he wanted her to do so is not convincing; that his claim she told him that the service of the papers was a mere form deserves little consideration; there was no competent evidence in support of his claim of deteriorated mental condition; that the claims of defendant were made for the purpose of avoiding what he belatedly decided was an improvident bargain; and that he was not offered evidence worthy of belief.

Defendant's default was entered, but judgment was not entered thereon. The question on plaintiff's appeal herein is whether the court erred in setting aside the default and permitting defendant to be heard in the action. The evidence should be viewed in the light favorable to the ruling of the trial court. When plaintiff commenced the first divorce action (about six months after the marriage), the defendant, who was then represented by his present counsel, insisted upon relying on the antenuptial agreement as a defense to plaintiff's claim for property. Thereupon, the plaintiff, who was then not represented by her present counsel, dismissed the action. About five months thereafter the defendant suffered a paralytic stroke which affected his speaking and walking. Thereafter while the parties were in the office of plaintiff's present counsel, the defendant adopted a suggestion of her counsel that they should cancel the antenuptial agreement (which defendant had relied upon in her former divorce action). Soon thereafter, according to defendant's affidavit, the plaintiff suggested that he return to Milwaukee, and she told him that she would resume living with him at any time he requested her to do so. About a month after the antenuptial agreement was cancelled, the parties were again in her counsel's office, pursuant to an appointment she had made. Defendant was not represented by counsel. After conversation relative to plaintiff's seeking a divorce and relative to

alimony to be paid by defendant, a written agreement regarding such payments and designating her as beneficiary of an insurance policy was prepared by her counsel and was signed by the parties. At the request of plaintiff's counsel, the defendant indicated approval of the complaint by placing his initials on counsel's copy of the complaint. Service of summons and complaint was made in the office of plaintiff's counsel on May 9, 1961. About the time such service was made, the plaintiff told defendant (according to his affidavit) that the service was a mere matter of form and had no legal effect in the event he wanted her to live with him. His default was entered on May 25, and on June 9 in the office of plaintiff's counsel the codicil was prepared by her counsel and was executed by defendant. Two days thereafter the defendant went to Milwaukee, and the next day after arriving there he sent a letter to plaintiff stating that upon thinking the matter over carefully he did not want to consider a divorce, and he had told his attorney to appear in court and oppose the divorce.

Of course, the fact that defendant's default was entered would not mean that plaintiff would be entitled to a divorce. In a divorce case, even if a default is entered, the plaintiff must establish facts sufficient to justify granting the relief sought. As above stated, only a default was entered herein —judgment was not rendered. In *Rehfuss* v. *Rehfuss,* 169 Cal. 86, 92 [145 P. 1020], it was said: "The rules of practice applicable to divorce actions differ in many respects from those which govern other actions. In an action for divorce, upon very slight showing the court will set aside a default, if application for relief be made in due time. . . . It is the duty of the court, representing the state, in accordance with the letter and policy of the law, to guard strictly against fraud, collusion, or imposition when the husband or wife seeks to dissolve the bonds which bind them together." (See also *Buck* v. *Buck,* 126 Cal.App.2d 137, 142 [271 P.2d 628] ; and *Gregory* v. *Gregory,* 92 Cal.App.2d 343, 345 [206 P.2d 1122].) In the present case the trial court could reasonably conclude that defendant, by reason of the paralytic stroke or strokes, was in a deteriorated mental condition and was not capable of understanding the significance of such legal expressions as "service of summons and complaint"; "entry of default"; and "independent counsel." The court could also conclude that by reason of such mental

condition the defendant could easily be influenced unduly in his business affairs, and that the plaintiff, by making the statements that the "service" was a mere matter of form and she would live with him when he requested her to do so, unduly influenced him to fail to answer the complaint. In view of the lack of representation by counsel, the lack of such understanding, and the exercise of such influence by plaintiff, the court could properly conclude that defendant was entitled to be relieved of his default under the provisions of section 473 of the Code of Civil Procedure. The affidavits herein presented questions of fact for the determination of the trial court. The court did not abuse its discretion in granting the motion to be relieved from the default.

Appellant cites *Couser* v. *Couser*, 125 Cal.App.2d 475 [270 P.2d 496], and asserts that the facts therein were remarkably similar in many respects to the facts in the present case. In that case judgment upon default had been entered, and the trial court denied the motion to set aside the judgment. On appeal the order denying the motion was affirmed. It was said therein (p. 477) that the test on appeal is whether or not the trial court abused its discretion, and that the facts must be viewed from the standpoint of those adduced by the prevailing party.

Appellant also cites many other cases wherein judgment on default had been entered. No useful purpose would be served in reviewing them, since the determination in each case depends primarily upon the particular facts involved.

Appellant also asserts in effect that defendant (the moving party) failed to show, at least prima facie, that if the motion were granted a different result probably would follow. Since no judgment has been rendered herein, it appears that no "result" has been obtained, and of course defendant could not show that a different result probably would follow.

The question on defendant's appeal is whether the court erred in granting $1,500 as attorney's fees to plaintiff's attorney for services in resisting the motion to set aside the default. Plaintiff did not make a request in her complaint for attorney's fees, nor make a written motion or notice of motion therefor. After the motion to set aside the default had been granted, counsel for plaintiff said: "Your Honor, before you rule on the matter of attorney's fees—." Counsel for defendant said: "There is no motion for attorney's fees." Councel for plaintiff said: "I made the motion orally the first time we were in Court and you took it." The judge said:

"There is something in the Minutes protecting yourself on it." Counsel for defendant said: "I object to the setting of any attorney's fees at this time, for one thing I would like to have an opportunity of showing that Mrs. Kesselman holds property of about $75,000." He stated further that he thought that counsel for plaintiff should have permitted defendant to file the answer and cross-complaint, and not build up large attorney's fees on something that is rather obvious. The record does not contain a copy of minutes showing a motion for attorney's fees. It seems to be implicit in statements made in the briefs by both attorneys that the minutes do not show such a motion; but in view of the statements of the judge and counsel for plaintiff, it seems that something was said previously regarding attorney's fees.

Section 137.3 of the Civil Code provides in part: "During the pendency of any action . . . for divorce . . . the court may order the husband or wife . . . to pay such amount as may be reasonably necessary . . . for attorney's fees if such relief is requested in the complaint, cross-complaint or answer." That section also provides: "In respect to services rendered . . . after the entry of judgment, the court may award such . . . attorney's fees as may be reasonably necessary . . . whether or not such relief was requested in the complaint, cross-complaint or answer." In the present case, as above stated, there is no request in the complaint for attorney's fees, and no judgment has been rendered. The judge stated that the order for payment of attorney's fees was not a condition upon which the default was set aside. Although defendant requested it, he was not given an opportunity to present evidence that plaintiff's financial ability was such that there was no necessity for allowing attorney's fees. If such an opportunity had been given, the defendant might also have shown the amount he had already paid as attorney's fees to plaintiff's counsel. (In plaintiff's brief it is stated that, at the time the complaint was filed, the defendant agreed to pay a reasonable fee to plaintiff's counsel, and he had paid it.) Since counsel for defendant had not rendered the contemplated services in a hearing upon the default, it might be that defendant was entitled to a credit upon the amount allowed by the court herein. In any event, since it appears that the basis for setting aside the default included undue influence exercised by plaintiff upon defendant when he was not represented by counsel, it would seem inconsistent to

require defendant to pay attorney's fees to plaintiff in her effort to justify her alleged wrongful acts. The court erred in making the award of attorney's fees.

The order vacating the entry of default is affirmed. The order allowing attorney's fees is reversed.

Fourt, J., and Lillie, J., concurred.